Good morning, Your Honors. Joshua Jones on behalf of Darius King, the appellant. In this appeal, we erased two issues, one related to the probation search and one related to the probable cause. I'd like to spend the first part of my time focusing on the probable cause issue, and if time permits, I would like to get to one of the specific underlying issues of the probation search. With regard to the probable cause issue, with regard to not Mr. King actually had possession of the law enforcement officers had probable cause to believe that he actually possessed the gun, I think it's important to keep in mind one specific thing. Frequently, defense attorneys are reminded that it's important to take into account the totality of circumstances and not to divide up specific facts. In this case, I think it's the totality of the circumstances that the law enforcement officers need to take into account. Law enforcement officers are not allowed to ignore evidence that weighs against the finding of probable cause, and here there were significant facts that weighed against the finding of probable cause. Specifically, first, the location of where the gun was found, hidden in a dresser drawer in a room that belonged to Ms. Schell, that had... About which there was substantial evidence, however, that your client was occupying. There was evidence that he was in the room, yes. Well, there was also evidence that he was, he had mail sent to him at that house. Yes, he had mail. So, taking again, the facts of the light most favorable to the government for the moment, let's assume, this is my problem with the case, so let me go right to it. Let's assume that when they seize the gun, it's 50-50. It could belong to, it could belong to the gun in effect. They're not really both there because your client takes off, but they're both in the room with the gun. Does your client's flight add anything to this analysis? I don't believe that it does, and for the record, we would dispute that it'd be 50-50 under those circumstances. Well, but I'm starting from the assumption, if you go, if you went in a room and there was a gun in the middle of the room, and two people were sitting there, and you had to figure out which one of them possessed it, you would say, I don't know. And then one of them runs away. That's not your case, I understand. Under those circumstances, would we have more than 50% with respect to the guy who runs away? I think given the nature of what we're calling running away in this case, that it would not push the envelope to probable cause for a few reasons. One, we know that there was a protracted police involvement in front of the house. They were in front of the house for more than half an hour prior to commencing the search. We know that they secured the train. There were two officers, and we have body cam footage showing that they were behind the residence just waiting there for 10 minutes before they entered the home. So we know that Mr. King did not leave in response to them coming in. He did not flee officers coming in. When did he leave the house, and at what point in this 30-minute time frame? All the officers, the only information the officers had at the time was they spoke to left while the officers were present. So we know that... Present, outside, talking with Michelle? Yes. And didn't she say when she was questioned that her husband was in the house? She did, yes. She did say that he... The wife says my husband is in the house, and then I guess it's his mother-in-law who says that he left when there was this commotion, the commotion obviously being the police. Right. And he leaves, among other things, in the room, his car keys. In other words, this and other belongings. This has all the earmarks of someone leaving in a hurry. I mean, by the time they got into the house, he was gone. Well again, and we don't dispute that he left during the time that the officers were there. But again, the officers were present before even entering the house. There's an extended interaction with Michelle outside of the house for half an hour. What does that have to do with whether he ran or not when the officers arrived? That's the inferences that he... That's what caused him to run. Well, again, I don't think it's accurate to refer to it as running. The fact that Michelle is being... Actually, he ran and ran because there was no one chasing him. But he left because the he knew what was in the room and he didn't want to be caught by the police. I don't think that that's necessarily a fair inference on these facts. Certainly, he left. It could be inferred that he left in response to the police. But I think that, you know, the nature... A bunch of cop cars showed up for a parking violation in front of the house and detained his wife. And there's interaction going on. He's had... It wasn't a bunch of cop cars all at once. It was, I believe, one car. And then they encountered his wife, who was on probation for assault. And for a variety of reasons, they became concerned that they might need help. There were four squad cars there within five minutes of when they got there. But the point is, there are plenty of reasons why a person might not want to get detained by the police. Without regard to the gun, whether it was his or the wife's. Right. You know... So let me take you to the... Let's assume you're right. The arrest was illegal, just for purposes of discussion. What follows from that? What would follow from that would be the suppression of his post-arrest statement. Well, that's... And this is what troubles me about your briefing in this case. There's not a lick of argument about that. There's nothing... I mean, not every post-arrest statement that follows an illegal arrest should be excluded. Our Fruit of the Poisonous Tree analysis is, like everything else, a 14-part test that looks at all sorts of things. And your brief never makes a single argument about why, if the arrest was illegal, the statements must be suppressed. Well, I presume that's because the government never contested our allegation that that was... Well, no, but it's your burden, it seems to me, if the arrest is illegal, to then say something flows from it. And there's... The brief just says, because the arrest was illegal, the statement must be suppressed. And that's not so. I mean, it might well be suppressible, but we'd look at how soon it was thereafter, whether there was pressure, how... All those sorts of things. Well, we do... I'm sorry. Yeah. But you don't make that argument in your briefs. You're correct. We don't... We certainly don't belabor the point. We just... Don't even belabor it. There's not a single case cited. We just state it. But I do believe there is evidence in the record, and we did... I mean, even below, we challenged voluntariness. We did not challenge that specific... No, but below, you made that argument. Below, you said, this is Fruit of the Poisonous Tree, and you briefed it, and... So why didn't you make that argument on appeal? Again, because we didn't believe that it was being contested, because the government has never claimed that it should not... Well, but you filed the opening brief. You don't know what the government's going to contest when you file the opening brief. That's correct. Or what they contested below. I mean, you could be relying on what they contested below. Right. Well, anyway, let's assume that, for my benefit, there wasn't probable cause for the arrest. What statements would you argue should be suppressed? Just to clarify, and there is evidence in the record. It shows that he was taken immediately to the station. He was questioned there, and in response to questioning, he stated that the gun belonged to him. That statement was included in the stipulated facts that were relied on by the... Okay, but the absent... So let's remove the statement that the gun belonged to him from the case. Yes. Wouldn't the police be able to determine whether or not the gun belonged to him anyway? I mean, I guess, hypothetically, there was no evidence that was ever turned over with regard to DNA or fingerprint testing that was done on the gun. In the absence of that, I think it's an extremely thin case, and with regard to whether or not it would be harmless, it would be the government's burden to prove that it was harmless beyond a reasonable doubt, and I don't think they could do that. So if the statement were suppressed, we'd have to have a new trial? Yes, we would have a very good... The gun would be... would either belong to his wife or him? Yes, and we have, I think, an extraordinarily strong argument that it would belong to Ms. Schell, since she was the one who was on probation. She was the one attempting to... Although she later says it's not hers. They don't know that at the time they do all this, so it doesn't go to the probable cause analysis, so I'm not sure how extraordinarily strong your argument would be. And she was the one that was on probation for an offense that was alleged to have involved firearms. Right, and she was the reason the House was searched. Yes, and it was... I mean, it's her room. Mr. King did not live there. It was her dresser. Yes. And did the police know that Mr. King did not live there? There's no specific indication. When questioned, Officer Arreola testifies that prior to this day, he had never encountered Mr. King there and was not aware that he... But isn't there substantial evidence that he did live there? I mean, it may not be... He's getting mail there. No, I do believe... And that is their strongest piece of evidence, that the two pieces of mail with his address on it, but everything that was associated with Mr. King was found in the bed. There was a book that he was studying. It was open, but they found the registration to his car. They found his... In effect, a book with notes in the room. Yes. They found his keys in the room. Again. They found letters addressed to him at that address in the room. Couldn't a magistrate judge or somebody, or us, reasonably conclude from that that he lived in the room with her? He doesn't have any belongings that you would expect somebody to have in the room if they were living there. There's no... But that doesn't ultimately come out. I know it doesn't matter, because it depends on what they knew at the time, that he did live there. No. The reality... He spent the night there the night before. Didn't he say he lived there? He lived with his grandmother at the address that his car was registered to. I'm sorry. I didn't hear you. He lived with his grandmother at the address that his car was registered to, which was a few blocks away. He had spent the night at the residence. At least my law clerk tells me that he checked the address of the registration. There's one digit off from the house of his wife's, and on the address itself, there's no... At least according to Google, there is no such house. The house where his car is registered to? Yeah. Unless it was a typo. I haven't specifically looked at it. This is just based on my information. Again, this is not information the officers had later in the case that Mr. King was residing with his grandmother, and that he had spent the night at his wife's residence. And that wasn't something that was super uncommon. Nobody's disputing that he was a regular visitor there. They were married. But the question is, this gun was hidden in a drawer in a room that had every indicia that it was controlled by his wife, a woman who was on probation for an offense involving a gun. Now, while it's true that the police can have probable cause to arrest two people for the same offense, two people could have joint possession, something of that effect, in this case, where the gun is hidden in a drawer, I think it presents a unique scenario. So could the police have arrested them both? No. I'm not saying... No, but in my 50-50 scenario, could the police have arrested them both? I think... Not... No, I don't... You just said that, and that's why I didn't think that was right. If he had it left. If there was evidence that they had joint possession, then yes. Yeah, okay. That's what I was saying. Okay. And so, let's point on it. Constructive possession. Is that different than possession? Yes, because constructive possession requires that the government have evidence to show the dominion and control over the room, which is why it's important that there aren't... So it doesn't matter that he doesn't live there. He spent the night there. He had dominion and control over the room the night before, didn't he? I don't... No. I don't think that a visitor to a room necessarily has dominion. Well, he's not a visitor. He's there sleeping with his wife. Well, I don't... It's true, but I have very little idea what's in my wife's dresser. Anyway, that's the end of my time. Thank you very much, counsel. Good morning, your honors. I may please the court. Helen Hong on behalf of the United States. Officers here did have a fair probability to believe that Mr. King and Ms. Schell both constructively possessed a firearm that was found in her room. Wow. They were married, your honor. Well, but it's in her... I mean, I want to follow up on your friend's last point. It's in her dresser. It's in her dresser with her clothes in a small glove. I assume small glove means a glove that would fit a woman, but I don't know. I don't know what's in my wife's dresser. That's what I was just whispering to you. And, you know, Judge Wardlaw's right. Unless you put it there. Unless I put it there. I mean, they're not likely, in my head, to be putting stuff in my dresser. Yeah, why is it... Now, I understand it doesn't appear that he has a dresser in the room, so that makes it a little bit different. Because he's not living there. But why does it make it more probable than not? We haven't got to fleeing yet. Why does it make it more probable than not at that point that it's his gun rather than hers? And I guess, first I'd start, the test isn't whether it's more probable than not. Whether there's a reasonable probability. It's just whether there's a fair probability, which is under that... Probability. A fair probability. Fair probability doesn't mean less than a probability. But I don't get about this case. Why do they assume it's his gun? When she's on probation. She's on probation for a gun-related offense. He doesn't live there. He doesn't have clothes there. He doesn't have indicia of living there. And it's in her dresser, in her glove. Why don't they... Actually, the probability is that it's her gun. And yet they find him walking on the street and say, oh, well, you have constructive possession. There's two responses, Your Honor. The first is that officers also believe that Michelle constructively possessed that firearm as well. And so they did arrest her. And she was arrested for being a felon in possession of a firearm. Officers also could arrest Mr. King because of the activities that had happened right before the firearm was located. As Your Honors noted, Mr. King was in the room. That was undisputed. He had unfettered access to the items in the room, including the mail with two different dates containing his name and that address. His keys, as Your Honor noted, for the car, vehicle, that was registered at an address with one number transposed. That's at ER 96. And then the fact that he had left. Beyond that, Your Honor... There was a fair probability from their perspective at the time that he actually resided in that room. That he, at a minimum, had unfettered access to the room. I don't mean he was domiciled. I mean resided. Correct. I mean, we do have testimony. I'm just curious. I want to be sure of my... Didn't he admit that he lived in the house ultimately? Not before he was arrested, Your Honor. I understand that, but ultimately he did. He provided a declaration in connection with the suppression hearing, admitting that he stayed there the night before. At the evidentiary hearing, the agent in this case testified, this is at ER 23, that Patrice, that's Michelle, told us that her boyfriend lived with her. And she said Darius. And then my partner came up with the name Darius King. In addition, we know from the interactions that the grandmother had indicated that Mr. King was also in that room as officers arrived. He left and slipped out the back, the grandmother said, as the commotion occurred. So if he'd remained there, could you have arrested him? I think we could have. I think the facts are better in the totality of the circumstances with the flight. And here's why. We also know from... I mean, I'm just... I mean, I don't know. I can well understand someone with a bunch of police coming up to their house just not wanting to be involved. And they're in a room. It's not necessarily their house. But not wanting to be involved with the police and just slipping out the back door. It's not like he took his car and got in his car and went away. He just sort of went for a walk. I mean, he didn't want to be around the police. I can certainly understand that. And that's one interpretation of his acts. What officers could also consider is whether there was another interpretation. And that's what this court has said. It's not necessarily indicative of wrongdoing, and we certainly concede that. But it's one of the factors that officers could consider in determining who among the two people that occupied that room, at least for that night, would have constructive possession of the firearm. And then an important fact that I think is missing, too, from the analysis thus far, is that officers knew that the defendant was a gun guy. I think the testimony was that he was a gun dude, and he was a weapons guy. How did they know that? There's record evidence that officers conducted records checks before they conducted the search. Right, they conducted records checks. And the record checks showed that he had been arrested for offenses involving firearms, but never convicted. Yes, Your Honor. And so can they rely on an arrest that didn't lead to a conviction to infer that he was a gun guy? Yes, Your Honor. At least at a minimum, that's something that the court could... or that the officers considered. And that's evident from this court's case, for example, in United States v. Nora, where this court stated, that criminal history can be helpful in establishing probable cause, especially where the previous arrest or conviction involves a crime of the same general nature as the one the warrant is seeking to uncover. Here, and that's at 765 F. 3rd 1049. Here we do have a prior arrest, two separate ones, with three intervening years in between, where the defendant had unlawfully possessed a firearm, or at least was arrested for that very same crime. We don't know whether he was acquitted or the charges were just never brought? We know from the pre-sentence report that ultimately charges were not brought and that the DA's office elected not to pursue the charges. But we also know from the actual pre-sentence report what the underlying facts are, which is that the defendant, at least as alleged in the reports, possessed a firearm on two separate occasions in 2007 and 2010. And what is the... usually the probation report says why the case went away. Does the probation report indicate that? It does not in the other arrest section of the pre-sentence report. It doesn't indicate why the charges were ultimately dropped. I know you've got limited time. I want to... Does the government agree that if the arrest was no good, the confession statements get suppressed? We do. I think in this case there's no attenuation argument that the statements... That's all I need to know. Yes, Your Honor. So we would also agree that if the court finds that there isn't probable cause, that the statements grounded the stipulated facts so that we couldn't make a harmless beyond a reasonable doubt argument in connection with the statement. But nonetheless, we do also think that there was probable cause to support for the reasons we've identified. I'm happy to address the argument that there wasn't sufficient evidence to believe that Mr. King was a felon. That's an argument that has been raised principally in the briefs. I would point the court to ER 23, which indicates that officers did a records check on Mr. King before they went inside the residence. That record indisputably shows that he'd been previously convicted of two prior felonies involving drug offenses. At ER 89, in the police report that was submitted with the actual documents in connection with the opposition to the motion to suppress, it states the records check revealed that King was a convicted felon and a documented and admitted gang member. And this is before officers made entry to conduct a probation search in the first instance. The arrest record as well included an arrest for a felon in possession charge, the penal code 12021 offense. That's at ER 105. So officers indicated that he had looked at his arrest history, that arrest history would include the arrest for being a felon in possession of a firearm, which would also add to the fair probability that Mr. King was a felon at the time that he was arrested. Would you give me the cite to NORA again? Yes, Your Honor. It's at 765 F3rd 1049, and it's cited in our answering brief as well. I'm happy to address any other questions Your Honor has, and if not, we're happy to submit and urge the court to affirm. Thank you very much. Thank you, Your Honor. I'll give you a minute. Thank you, Your Honor. I just wanted to briefly clarify two points that were made. First, the government cited to a portion of the transcript in which Officer Areola indicated that Michelle told him that Mr. King lived there. We have the video footage from Areola's body cam that covers all of the conversations he had with Michelle. Michelle never says that he lives there. She says, I believe she's inside. She said he was there. He didn't say he lived there. I also wanted to just talk briefly about this gun dude issue because I think it's problematic. If you watch the video camera footage, one officer does say as he's looking at something, oh yeah, Darius, he's a gun dude. That's not the officer that the government elected to call at the evidentiary hearing. There's no evidence whatsoever as to what the basis for that is. There is evidence that they checked his record. There is evidence that they... That they did a records check on him before he was arrested. That's correct. There was dispute at the evidentiary hearing as to what was shown to him, but they did do a records check. So that could have easily simply reflected some of the 7- and 10-year-old arrests that have been discussed. Thank you. All right, thank you, counsel. United States v. King is submitted.
judges: Wardlaw, Hurwitz, Korman